The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable. You may be seated. We'll jump right into our first case today, Crosby v. Colleton County Sheriff's Office. Good morning, Your Honor. May it please the Court, my name is Nick Charles. I represent the plaintiff and appellant in this case, the estate of Jerry Crosby. This case arises from a situation that is important in our country today and seems to become more important by the day if you follow the news. And that's the collision that occurs when police conduct welfare checks. The collision between law enforcement activities and the most sacred and protected Fourth Amendment rights that we have, which is the right to be secure in your home and free of governmental intrusion. In this case, and I'll be- So in this case then, this is a wellness check, something different. We use the Graham factor to evaluate the officer's conduct? For the use of force itself, yes, but importantly, it's the totality of the circumstances which includes a consideration of the officer's unreasonable conduct that leads up to the use of force. In this case, when Officer Scott, so he, I'll be very brief on the facts, I know the Court knows them, but Officer Scott was dispatched to conduct a welfare check based on a call from Jerry's wife that said that a couple hours earlier he had said that he would harm himself. And when Officer Scott arrived on the scene, he found a scene that whether you view the components of it in a totality or in isolation would not lead any reasonable person to believe that something was wrong. Certainly not that there is an emergency.  Yes, Your Honor. Given the phone call? Because I can definitely, I mean, having watched this entire video, I can definitely see how a person who received a report of that welfare check and arrived to find what this officer found might very much suspect that something was wrong. Based on this Court's precedent and then the case v. Montana case, the one that this Court rescheduled this oral argument to wait on, the precedents are that a 911 call alone is not enough. And arriving at the scene, the officers need to see some kind of objective and affirmative signs of an emergency. And what this officer saw was a dog barking, a truck in the driveway. This is a rural... Absolutely no response to repeated knocks and announces? Correct. None. Not, not go away. Not I don't want to talk to you. Absolutely no response. Which is Jerry's constitutional right to ignore the police. He doesn't have to come to the door. He's entitled to leave his, his doors unlocked. Sure, but I understand a person is allowed to do that as a matter of the Fourth Amendment. I just don't think it's reasonable to say that from a reason, as a reasonable officer knows that the overwhelming majority of times that people are there, they at least say something. Doesn't every reasonable police officer know that? That might be something that they normally... Like go away, including go away or get the hell, get off my property. But, but what's very, very, my suspect, unusual in a situation like this is that the person says nothing at all. I doubt that's that unusual, Your Honor. I mean, yes, people probably often come... What about hushing your dog, right? Sorry? What about hushing your dog? If you're at home and somebody's, your dog's barking, you're awake and conscious, it's probably going to annoy you, right? And you'll say, you know, hush up Sparky, right? There's nothing. And it may not be suspicious without the call, right? But once you have the call, do we want the, do we want the officer to check on this man? Check on him, yes. Not enter the house without a warrant. And to answer the question about the dog, some people hush their dogs, some don't. I mean, my dog barks at the neighbors when they're in their garage across the street. If your dog barks, I suspect, you know, a little bit, once, twice, five seconds, 30 seconds, I suspect your dog doesn't bark for minutes without you hushing them. Unfortunately, I wish I could say the answer was different. Look, I understand you might try to hush them and you might fail, but I suspect that your dog does not bark for minutes at a time with no effort to hush them. If, I don't want to get too far outside the record into my personal experience with my own dog, but it depends on what he's barking at. If he's barking at a person prowling around the outside of my house, shining a flashlight in the windows, then I'm going to let him bark. If he's barking at my neighbors who are mowing the yard across the street, then I am going to hush him. And here... You've had 15 minutes and we've been talking about aggressive circumstances. You're not going to win on that, either with me. Talk about the direct, talk about the shooting. That's what's important. Your Honor, the shooting, as we know, it's evaluated by the totality of the circumstances. The Barnes v. Felix case from the U.S. Supreme Court that came out last year emphasizes that it's not a moment of force analysis. It's the totality of the circumstances, including a consideration of what led up to the use of force. Let me ask you in that regard. It seems to me like it falls down to that gun and what he said. Just before he shot, the officer said something, don't go. What does he say? Don't pick up the gun, don't point the gun, don't shoot. Does the record say, give us any answer to any one of those questions? I'm sorry, Your Honor, I... Does the record give you any answer to any one of those three things? Don't pick up the gun, don't point it, or don't shoot me. That is not what Officer Scott said. He said, no, no, no, don't, don't, don't, as Jerry is walking... Is walking deliberately and calmly while staring at the officer to get a gun. He's walking deliberately and calmly across the bedroom. I just, I just feel like, I mean, this case is horrendous in so many respects, but I don't understand how you can tell a police officer that you have to watch a person calmly and deliberately ignore your commands to stop as they go over and retrieve a firearm. I don't understand how a reasonable officer can possibly be, much less, much less how a reasonable, much less how it would be objectively unreasonable in violation of the Fourth Amendment and so objectively reasonable in violation of the Fourth Amendment as to deprive qualified immunity that you have to let a person calmly and deliberately while staring at you go over and retrieve a gun. Yes, Your Honor, the precedents are that commands have to be clear. No, no, no, don't, don't, don't is not a clear command. And also say that officers are reasonable to think that a person who greets the police with a firearm doesn't have a right to do so, right? That is a line... That person poses a danger to the officer. That is a line, I think it was in either the Elliott or the Stanton case, but the other cases that we cited in our brief like Nibbs and Benton and Cooper... Police, right? There was a person, but they didn't realize a police officer was at their door. They didn't realize officers were out there, right? There were questions along those lines. Here, none of that's in dispute. Well, I mean, one of those cases, I think it was Nibbs, the court acknowledged that anyone can say that they're a police officer. In this case, Officer Scott stalked down the dark hallway with his gun drawn, with a powerful flashlight into a dark room, stood in the doorway, and no matter how many times Jerry said, I'm fine, get out of my house, Officer Scott said, I won't. But in response... Oh, yeah, this is a welfare check. And the officer says, I don't know if this is an exact quote, but he says something like, did you take anything, which feels like a highly germane question when conducting a welfare check, particularly given what the officer had found outside. I mean, particularly given what the officer had found outside. And on the video, the decedent does not respond to the question, did you take anything? The decedent just says, get out again. So in response to the officer's direct question, which is directly germane to the reason the officer is there, the decedent gives a non-answer. Why isn't a reasonable officer allowed to be very concerned about that? I can't finish the welfare check until you answer the question, did you take anything? The officer didn't have, obviously my position is that the officer didn't have a reasonable basis to be in the house in the first place. And that nothing he saw outside nor anything that he saw inside gave him a lawful right to be where he was. Now, at that point, when Jerry says, I'm fine, get out of my home, any purported emergency, a reasonable officer should deem that any purported emergency is over. Sorry, sorry, I'm not sure that's at all true. What if he had taken a fatal substance? Well, as a matter of fact... A person who has ingested a fatal substance has a legally protected right by the Fourth Amendment to order the officer out of their house so that they can die alone in peace in their house? I'm just not aware of any proposition in the Fourth Amendment that says... So you said, once he says, I'm fine, the officer is required to simply accept his word for it and leave, and I am not sure what principle of the Fourth Amendment says that. It also, Your Honor, goes into the reasonableness of the use of force, though. And Jerry says, I'm fine, get out of my home, numerous times. He then gets up calmly, walks toward the closet, and in the face of unclear commands, he picks up a gun. At that point, when he's asked the police to leave numerous times, and the police officer refuses to leave, and Jerry can't see him, and he's wearing what is not a normal... He's not wearing a blue police uniform, he's not dressed like the deputies downstairs. He is wearing tan pants and a black shirt, and that's it. But he's wearing a police... Yeah, that's a police uniform. It has a badge on it that says it's police. It's not blue, it's tan and black. Well, we've sent a sheriff on a tiny patch in Randolph. What do you say about Judge Gergel's remark that there's just no evidence whatsoever in this record that the decedent... There is no evidence in this record to create a genuine dispute of material fact about whether the officer should have believed that the decedent might not have realized he was a police officer. I think I've correctly stated the Fourth Amendment question. Judge Gergel just says there's literally nothing that would support that finding, that a reasonable officer should have known maybe he didn't realize I was a police officer. When he's standing there in the doorway, having unlawfully entered the house and having... Whether he's lawfully or unlawfully entered the house has nothing to do with whether the officer should have realized that the decedent might not realize he's a police officer. That might be why the decedent would be very angry, but that doesn't bear out in any way on the question of whether there's a dispute about whether he realized he was a police officer, which is what I'm asking you about. I believe it does, Your Honor. Mr. Charles, I want you to focus on... The case law says it's a furtive and threatening move.  And I assume that everybody's relying on the video. And that's the reason I asked you a while ago where it looks to me that video looks like it's a handle. It's not the barrel of a gun. I can't see the barrel of a gun. Correct. So I don't know... To me, there's a reasonable question of fact. The jury can decide, did he make a furtive move? I don't think so. And was he threatened? It's his home. He goes and reaches for something. And it looks like a wooden stock. It doesn't look like a gun. Is there any evidence to show that that gun was pointed at any certain man or girl at all? No, Your Honor. So why doesn't the current case law protect you in terms of giving you a trial by jury? It does. It does. He did not make a furtive movement. He did not make a threatening movement. So you think getting out of bed, crossing the room to retrieve a gun is not a furtive movement? Getting up and walking calmly and deliberately across the room is not a furtive movement. Reaching into the closet and picking up a gun, keeping it pointed at the ground is also not a furtive movement. Where in our case law does it say that you have to point the gun at the officer before the officer has authority to shoot? It doesn't. It is aimed at or a furtive movement. And he did not make a reasonable jury could conclude that he did not make a furtive movement when much like Nibs, the case where the person racked a shotgun, Benton, the case where the police charged in and the guy came running out and pulled out a gun. In those scenarios, and I think the Cooper case too, in those scenarios the court considered whether a reasonable jury could find that the officer shouldn't have been threatened by a person who in his own home picks up and holds a gun but does not aim it at the officer. And that's the situation that we have here. And in Nibs the person was in their own home and the officer was outside, right? Correct. In the dark. And so you're saying that's the same, that the Constitution requires the officer comes in and says, I am a police officer. The person says, oh yeah, gets up, goes and gets the gun. At what point does the Constitution say the officer is right to fear for his life? When? When the gun's like 90 degrees, 45 degrees. Where? How much does it have to be pointing at him? That's for a jury to decide whether the officer should have been.  Yes, it is. Whether a reasonable officer would have been threatened by the movement. That clearly established case law seems to say that an officer doesn't have to wait for it to be pointed at him. The officer may not have to wait for it to be pointed at him but a jury has to determine whether it's reasonable for an officer to conclude based on the movements that he sees whether he feels threatened and thus deadly force is justified. Do you think a reasonable person would not feel threatened if someone greeted them by going across the room to retrieve a gun? I think a reasonable jury could find that the officer... That's not a threatening thing to do. Correct. Yes, Your Honor. After he calmly and deliberately walked over there, he didn't run over there, he didn't... Would running make the difference? Is that where we should draw the line in our case law? If he ran to get the gun versus if he walked to get the gun? It could make a difference to a reasonable jury viewing these facts and importantly, I know that I'm out of time, but the facts have to be construed in the light most favorable to the plaintiff. We have a video, right? We look at the video and if there's any doubt, we construe it in favor. And the video doesn't show him pointing the gun. It shows him picking it up and it's pointed at the ground and then the officer fires. And I apologize for going a few seconds over, but I ask the court to reverse the district court's ruling. We'll hear from Mr. Griffith. May it please the court, Mitch Griffith on behalf of the appellees, Colleton County Sheriff's Office, Officer Jake Scott, and Buddy Hill, Sheriff of Colleton County. If a picture's worth a thousand words, the video shows the whole story in this case. The video's clear, and I submit to you that there's very little to debate on the facts. It's all on the video, as the court has seen. Tell me if it's so clear. Where do you see a barrel in that gun? When he goes to pull that wooden stock out of something, where's the barrel? Yes, sir. I'm willing to be correct about that. Yes, sir. And if you look in the record, the SLED report and Officer Scott said he leveled the gun, meaning he was bringing it up at the time that he was coming across when Officer Scott was backing down the hallway, yelling, no, no, no, don't, don't, don't. The video works up until two seconds before that pistol was fired, so what am I missing? The video works through it, and we see the gentleman walks across, Mr. Crosby, walks across his road. At that point in time, he fails to acknowledge the commands of no, no, no, don't, don't, don't. Officer Scott had indicated in his deposition that he thought he had a gun as he was laying in the bed. However, when he gets up, goes across the room to a closet, and then comes from behind the door, he's got what Officer Scott identifies as a gun. Now, does the officer have to wait for him to actually have the gun pointed at him, finger on the trigger? I don't think that's what the law says, and I don't think that's what the Fourth Amendment says. It's reasonable. He had a reasonable belief that he was in danger. If he didn't, he certainly wouldn't have been backing back up. He was looking for someplace to get away from him. He took what action was reasonable under those circumstances, and he doesn't have to wait for Mr. Crosby to have his finger on the trigger, ready to shoot him. I'm not terribly hot about this particular argument, but I think I told Mr. Crosby that. I don't think he can win on this, but the argument is this. His affect is he looks to be reasonably clear-eyed. He's not wobbling around. He walks, he's standing up, he says, I'm fine. He tells that officer, eight times, get out of my house. When does exigent circumstances stop? When does exigent circumstances stop under that situation? Yeah, when should the officer turn around and walk out? In this situation, Officer Scott indicated that he had seen a suicide note, he had seen pills, he had seen what appeared to be a glass turned over and his phone down on the floor. Indications that a reasonable officer would have an objectively reasonable belief that exigent circumstances exist. He goes in the house. He walks down the hall. He identifies himself as Sheriff's Office. Now, he's been called in the appellant's brief a nocturnal trespasser. However, at that time, the first comment from Mr. Crosby was, what can I do for you? Not what you would understand a trespasser, what you would probably say to a trespasser. Your first comment is, get out of my house. Now, when you ask, where does exigent circumstances end? If we look at Montana, Montana says, at the end of the opinion, we don't have to let someone to wait on their own fate, walk away and leave them to their own fate. I don't think that exigent circumstances really ever ended in this case. If the man's trying to commit suicide, which we've got all the factors that show an objectively reasonable belief that he may be, and he says, get out of my house, is he still contemplating suicide? If you listen to the video, actually, if you close your eyes and listen to it, his voice changes when Deputy Officer Scott says, I'm here to check on you. At that point in time, you can actually hear the inflection of his voice change. Is he planning on continuing to commit suicide? Should the officer turn around and walk out? That's exactly what Case v. Montana says. No, we don't leave them to their fate. We're there to check on them. He said, let's go downstairs and talk about it. He wanted to get him outside. He had, I believe, at that point in time, animal control was still coming, although they had taken care of that situation. But in addition to that, they had other officers coming to check on him. They wanted to make sure, maybe a professional to look at him and say, the EMS to say that he's not on any kind of alcohol. While you say he walked across, Deputy Scott says he sounded like he was slurring a little bit. As such, he's still trying to, in the situation, that he has actually an emergency aid and wants to have a professional look at him. I don't think, in this case, emergency aid ever ended in this case. Even though he said, get out of my house, it already had the conversation. Now, while I would speak to the elements of emergency aid, it does appear that all the factors need to have the officer have a reasonable belief that emergency aid exists. We've also got the fact that as we talk about the excessive force case, I think, as Judge Rushing said, we don't have to wait for the gun to be drawn down on us under the Fourth Amendment. We only have to be reasonable. In this situation, it was obviously reasonable for the officer to think that he was about to be shot. As a result, he met force with force. We think the case law supports this and the video, in this case, supports the facts that he came out. I think, actually, having a gun pointed at him is probably a distinction without a difference in this case. As to the issue of qualified immunity, obviously, qualified immunity, the district court found that there was no violation of the Constitution. As a result, there was no need to go into the qualified immunity, into the second prong of the qualified immunity step. As such, the law, as well as the facts in the video in this case, show what Officer Scott did was reasonable on that day. in entering the home with exigent circumstances, as well as with his actions with respect to the force that he felt that he believed was deadly to him. Where did he say that? Where in this record did he say that to the EMS people, SLED, or anybody else? Where did he say that? He didn't say SLED was coming. No, sir. He said that he had emergency. I believe he said... Excuse me. He said that he had someone coming. I believe an ambulance was coming also. And, Judge, I can't point to the record right now where that is, but I believe there is no indication of SLED coming. I think it's the ambulance. My question is, what did he tell the EMS folks? He didn't say my life was threatened, I would be in danger. He didn't say anything like that. When he finally got in touch with the EMS, EMS was on the way. I think he said, if I'm not mistaken, expedite, when he was down in the porch. And he told Officer Cummings to step outside so that you can communicate. And this is an area that is way off the beaten path, pretty much, in Colleton County. It's out on the river. It is actually visible from a main road, but it's sort of strange to get there. So he had Officer Cummings outside, and I believe that when he was on the porch, Judge Boyd, he said, expedite. Now, with that, I go back to the issue of qualified immunity, and in this case, obviously, Judge Durgill found that where a warrant is not necessary, exigent circumstances existed. There's no constitutional violation. He also found that when you have an exchange with a person laying in bed, he gets up, walks across his room, hits the firearm, ignores the commands to stop, stop, stop, no, don't, don't, don't, then pulls the gun up, and at that point in time, Officer Scott had a reasonable belief that his life was in danger. As such, there's no constitutional violation, and as a result, we think that the evidence shows in this case that Officer Scott was very reasonable in his approach to the house. He checked the car, listened for noises in the house. There was no response. He kept trying to get a response. He honored the sanctity of the home when he used constraint and restraint before going into the house, and when he sees the suicide video, excuse me, suicide pills in the phone on the floor, he has reasonable exigent circumstances. As such, the Fourth Amendment protects officers and protects from unreasonable invasions of the home, unreasonable use of force, and in this sense, the video shows that in every sense of the word, Officer Scott was reasonable in this case. Are there any other questions? Can I ask you about Monell liability? If we, you know, there's two prongs to the qualified immunity analysis, and if we ruled on a clearly established prong, not on the constitutionality question, prong one, it might still be a Monell question, right? Is there any evidence of a pattern that was submitted in this case? Did the plaintiff present any evidence of a pattern of similar events, similar violations in other circumstances? No, ma'am. Not from the Covington County Sheriff's Department, not from Officer Scott. Not having anything in his background, I think they did fill the record with an issue he had when he was with the Buford County Sheriff's Department, which there was no finding of any probable cause to bring that against him. So there's no pattern here. As such, first of all, since his actions were all constitutional, we don't even have to get to the second prong, but to get to the second prong, I think there is no pattern here that there's anything to establish that the Covington County Sheriff's Department did anything that would have been, that would have raised an issue with regards to Monell. And there was evidence that the Sheriff's Office trains officers on Fourth Amendment issues, right? They do train officers on Fourth Amendment issues. The Fourth Amendment issues are within their policies and procedures. They even talk about, I don't think that exigent circumstances were probably as developed as we had with Case. And I think maybe Caligna came out right around the time that this actually happened. So no, ma'am. Anything else? I appreciate your time. Thank you. Mr. Charles, you have some time for a rebuttal. Mr. Charles, before you get started, I have a question I'd like you to address at some point during your rebuttal. I don't care if you do it right away, but I want to say it. So can you just help me understand, as a matter of the Fourth Amendment, why— I understand why a furtive movement might be threatening. I don't necessarily understand why a furtive movement would be categorically more threatening than a slow and deliberate movement, because in some ways I can imagine a world in which there's nothing as terrifying in the world as someone slowly and deliberately doing something that you perceive as threatening. So if at some point you could just address my intuition that I'm not sure why for the Fourth Amendment the fact that it was slow and deliberate rather than sudden and furtive categorically makes it less threatening. If it's okay with Your Honor, I'll try to think it out. Absolutely. No, I just want you to address it at some point. I don't care what happens. Judge Floyd, to answer your question of Mr. Griffith, Officer Scott did not call EMS until after he shot Jerry Crosby. When he arrived on scene and he first starts searching the property, he called for animal control because we need to secure this dog so we can clear the house. So that was before he had entered the house at all. That was after he had knocked on the door. He'd already decided we need to clear this house, and so he called animal control. At that point, he hadn't even seen anything amiss yet, but I know it's an objective test, but what happened and what he thought does matter for the consideration of what a reasonable officer on the scene would believe. After he entered the screen room and he found what he interpreted as a suicide note, he found the pills, he got on the radio, and he said, expedite animal control, and who is the on-call CID? CID is the Criminal Investigations Division. So when he saw the pills and he claims that he thought that a suicidal overdose was in progress, he called the dog catcher and the homicide detective. He didn't call EMS. He didn't call anybody to come help if, in fact, an overdose was going on. When he walked up into the hallway and he called out Sheriff's Office and Jerry replied, what can I do for you? Well, that language is also not the language of a person who is in the process of committing suicide. And all of those factors play into the totality of the circumstances and the reasonableness of Officer Scott's conduct as he approached the room and escalated the situation into what ultimately became him using deadly force against Jerry. On the factual point about whether Officer Scott thought that Jerry had a gun in the bed, there's no evidence in the record that would support that belief. That appears to have been a hunch, but they didn't find the gun in Jerry's pocket until an autopsy days later. It was never visible in the room. No one even on the scene giving emergency aid to Jerry after he'd been shot found that. But you're right that it's an objective test, right? So there's no reason to think he had a gun in the bed with him even though he did. Similarly, he'd gone behind the door and retrieved something that looked like a firearm but wasn't a firearm. But an objective officer could believe that his life was being threatened, right? Even if it wasn't a gun. We have plenty of case law like that, don't we? We have some case law like that in different factual contexts. But again, it is a question for the jury whether a reasonable officer would perceive his slow and deliberate movements, which I know I need to address, as being a threat, an immediate threat that required the immediate use of deadly force. The furtive movements, the answer to the question, I believe, is that it just impacts the reasonableness of an officer's actions. A sudden furtive movement is more threatening than a slow and deliberate movement. I'm not sure why that's a categorically true statement as a matter of the furtive movement. I could imagine situations in which there is nothing more terrifying to me in the world. Let's say that I know that there is a gun on that table and you start walking towards it and I tell you to stop. And you do not stop. You do not speed up. You do not slow down. You keep walking. I tell you not to and you keep doing it. I don't actually know why. The fact that you're completely ignoring my increasingly fervent commands that you stop what you're doing and yet continue doing it anyway, that almost to me seems more threatening. Because now I know that you hear me and you're disregarding it. You wouldn't have the right to shoot me right then, though. But I don't have to wait until you have the gun pointing. I quite assure you that I do not have to wait until you have the gun pointing at me if you slowly and deliberately walk towards what you and I both know is a gun over there. You don't have to wait until it's literally pointed at you. Do I have to wait until it's in your hand? I believe so, yes. A police officer has to wait until a suspect picks up the gun that the officer has ordered the suspect not to pick up. You have to wait until they have physically picked up the gun. I don't think a police officer can shoot an unarmed man who... What if their hand is 2 inches away from the gun? Can you shoot them then? That goes back again to the question the jury has to decide at what point would a reasonable officer have felt threatened by the movements. Why does a jury decide? I'm just... We're talking about qualified immunity, right? The question is not whether any jury could hypothetically find that it was not reasonable. The question is is it clearly established that it was unreasonable? That's one prong, and I'm arguing about  Yeah, but there's two prongs. There's two prongs. You can lose on either one. I'm out of time, Your Honor. Could I address the Monell question that you asked me briefly?  That is an important point because, as Your Honor said, if you find that it's not clearly established but you find that there is a constitutional violation, the Monell claim can survive. And the evidence here is that the Cullinan County Sheriff's Office provided no training of any kind to its deputies on welfare checks, how to conduct a welfare check, or the emergency aid exception to the warrant requirement. And the evidence is also that the Cullinan County Sheriff's Office conducts 500 to 600 welfare checks a year. This scenario is very similar to the hypothetical that the Supreme Court posed in the city of Canton case about officers using deadly force or being armed to chase felons without having any training. It is a moral certainty that Cullinan County Sheriff's deputies will come into this scenario in which they collide with a person's Fourth Amendment rights in the home, and they provide no training. They do provide training on when you can enter a home and under what circumstances, right? It's kind of a question of specificity. At what point does the Supreme Court's precedent on that, not even precedent, hypothetical, on that point kick in? They provide no training on the Fourth Amendment that would guide them on a welfare check. The Fourth Amendment training that they receive is like hot pursuit. It's all in a criminal context. They have no training whatsoever. But it's about entering the home, when you're allowed to enter a home and when you're not, and how you conduct yourself there. It is, but the only, again, no training on the emergency aid exception either, and the only policy they have on emergency aid says that they may enter to protect life and safety. It provides no detail for how an officer is able to figure that out or determine what to do. So I'd ask your honors to find a constitutional violation, even if you find that the law wasn't clearly established, to reverse some of those on the Nell claim. Thank you, Ron. Thank you for your argument. We'll come down and... All right, we'll come down and greet counsel, and then we'll proceed to our next case. CASE CLOSED
judges: Allison J. Rushing, Toby J. Heytens, Henry F. Floyd